## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Derrick Z. Smith,                              Case No. 20-cv-1163 (JRT/DTS)

      Petitioner,

v.                                             **REPORT & RECOMMENDATION**

Guy Bosch,
*Warden MCF-STW*,

      Respondent.

---

Petitioner Derrick Smith was convicted of aiding and abetting first- and second-degree murder in 2018. *State v. Smith*, 932 N.W.2d 257, 264 (Minn. 2019). He is currently serving a life sentence with the possibility of release. *Id.* at 264. Smith has now petitioned this Court for a writ of habeas corpus, claiming the State violated his rights under *Brady v. Maryland*, by failing to timely disclose all exculpatory evidence against him. This Court earlier ordered the parties to expand the record and supplement their briefing. Based on all the filings including the newly-expanded record, the Court recommends Smith's Petition for Writ of Habeas Corpus [Dkt. No. 1] be denied.

### FACTS

**The Murder**

Richard Ambers was murdered in Minneapolis on October 29, 2016. *Smith*, 932 N.W.2d at 262. The murder was allegedly committed by a conspiracy of four people: petitioner Smith; a woman named Ayan Wahab, a sex worker for whom Smith pimped; Tyrel Patterson, one of Wahab's two drivers; and Brandy Jaques, Wahab's other driver.

*Id.* After realizing Ambers had drugs and cash, Smith allegedly devised a plan to have Wahab rob Ambers while they were in a hotel room. *Id.*

Wahab and Ambers did not go to the hotel as planned, but instead drove to the home of Ambers's friend, also referred to as his sister in the trial record. *Id.* Ambers then drove Wahab to Jaques's house, where Wahab lived, and parked in front of the house. *Id.* at 262-63. Ambers stayed in the car while Wahab went inside where Jaques and Smith were waiting. *Id.* Smith was mad that Wahab returned without drugs or money and sent her back out to Ambers's car. *Id.* Wahab returned to Ambers's car and got in. *Id.* at 263. While Ambers and Wahab were talking, Patterson came outside and pulled Wahab from the car. *Id.* Wahab began walking toward Jaques's house and heard three gunshots; she did not look back. *Id.*

## II.   The Trial

Smith was initially charged with aiding and abetting second-degree murder but was later indicted for first-degree felony murder and second-degree murder. *Id.* at 263. Smith, Patterson, and Jaques were detained in the Scott County jail. *Id.* Between December 5, 2016 and January 23, 2017, telephone calls that Jaques and Patterson made while detained in the Scott County jail were recorded. *Id.* Smith's defense counsel requested those recordings from Hennepin County prosecutors on June 29, 2017. *Id.* The prosecutors did not receive the recordings from the jail until mid-December 2017 and only on December 27, 2017, six calendar days before Smith's trial was scheduled to begin and just before the New Year's holiday weekend, Smith's counsel was given access to 75 hours of calls were available for review. *Id.*

On January 2, 2018, the morning of Smith's trial, his counsel requested a continuance to review the recordings. *Id.* The court denied the motion but instructed Smith's counsel to renew the motion if they found anything exculpatory in the recordings. *See id.*; Decl. Mesa-White 1, Dkt. No. 35. Smith's counsel reviewed about eight of the seventy-five hours of the recordings and summarized several of those calls. Decl. Mesa-White 1-2, Dkt. No. 35. On January 8, 2018, Smith's counsel renewed the motion for a continuance, providing the court with their call summaries and arguing the unreviewed calls included possible *Brady* material. *Id.* at 2. The court denied Smith's renewed motion for a continuance, the trial proceeded, and Smith was convicted. *Smith*, 932 N.W.2d at 263-64.

## III.    The Appeal

Smith appealed his conviction to the Minnesota Supreme Court arguing, among other things, that the trial court abused its discretion by denying Smith's motion for a continuance. Pet. Ex. 2, Dkt. No. 17. Though he made no formal claim that his rights under *Brady* had been violated, he adequately presented the operative facts and legal basis supporting such a claim, including invoking *Brady* by name. *See* Order for Party to File Document/Respond to Court [Order] at 7-12; Dkt. No. 42. Nonetheless, the Minnesota Supreme Court's decision analyzed only whether the trial court abused its discretion by denying Smith's motion for a continuance:

> We turn next to the question of whether the district court erred when it denied Smith's two continuance motions. "The granting of a continuance is a matter within the discretion of the district court and its ruling will not be reversed absent a showing of clear abuse of discretion." *Dunshee v. Douglas*, 255 N.W.2d 42, 45 (Minn. 1977). We, therefore, must "determine whether the defendant was so prejudiced in preparing or presenting a defense as to materially affect the outcome of the trial." *State v. Lloyd*, 345 N.W.2d 240, 247 (Minn. 1984). Here, in the face of a likely discovery

violation, the district court twice denied a motion for a continuance so that the defense could listen to recordings of jail calls made by Smith, Patterson, and Jaques.

Assuming without deciding that the defense did not have sufficient time to review the calls, Smith has failed to demonstrate that the denial materially affected the outcome of the trial. At the time of trial, both Patterson and Jaques had pending charges. Patterson pleaded guilty to first-degree murder on August 8, 2018. *See Register of Actions*, 27-CR-16-33298. Jaques had her murder charges dismissed on September 10, 2018. *See Register of Actions*, 27-CR-16-33308. Neither was called upon to testify in Smith's trial. Had they been called, they could have asserted their Fifth Amendment privilege against self-incrimination. *See Johnson v. Fabian*, 735 N.W.2d 295, 310 (Minn. 2007) (holding that a defendant can claim the privilege against self-incrimination until conviction, and as long as a direct appeal of that conviction is pending or the time for direct appeal of that conviction has not expired). The jail calls, as the district court noted, would likely have been inadmissible hearsay.

Additionally, the State argues persuasively that Smith has failed to provide any additional evidence of prejudice. Assuming that the jail calls included some relevant and admissible evidence, and that a continuance would have allowed Smith to find and use it, Smith's counsel have had ample time to listen to the calls in the year since his conviction. Yet nothing in the record or in Smith's brief suggests that such evidence has been discovered. The only apparent item of interest discussed in Smith's brief was a call from Jaques that served as the basis for Smith's renewed motion on January 8, 2018—more than a year ago. Because Smith has not carried his burden to demonstrate prejudice, we cannot say the district court abused its discretion by *denying Smith's motion for a continuance.*

*Smith*, 932 N.W.2d at 268-69 (alterations and footnote omitted) (emphasis added). In a

footnote, the decision stated:

Smith argues that the analysis should be one of a discovery violation. The State, however, correctly notes that the district court never decided whether turning over the recordings of the jail calls sometime in December was, in fact, a discovery violation. Although the State conceded at oral argument that turning over the recordings in December, even if due to delay on the part of Scott County law enforcement, was a discovery violation, the posture of this claim on appeal remains a question of *denial of a continuance.*

*Id.* at 268 n.4 (emphasis added).

4

**IV.    Habeas Petition**

Smith's petition alleges that the prosecution's late disclosure of the recordings was a denial of access to exculpatory or favorable evidence and therefore violated the due process guarantees enumerated in *Brady v. Maryland*, 373 U.S. 83 (1963). Pet. Supp. Mem., Dkt. No. 34. Earlier briefing focused mainly on whether Smith's claim had been procedurally exhausted. After determining it had, the Court ordered the parties to produce the recorded calls, a transcript of Smith's trial, and all filings or transcripts relating to Smith's motions for continuance at trial. Order at 14; Dkt. No. 42. The Court also ordered supplemental briefing to address three questions: (1) whether the jail calls recordings included *Brady* material; (2) what, if any, prejudice Smith sustained by lacking timely access to those recordings; and (3) whether the Minnesota Supreme Court's adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States under 28 U.S.C. § 2254(d)(1).

Smith has identified four jail call recordings that he alleges (and the State agrees, see below) are "Brady material" for purposes of this petition. They are each summarized here:

| | |
|---|---|
| Exhibit B to Mesa-White Decl., Dkt. No. 81-2 (Call B) | Jaques and caller Ginger discuss: (1) Wahab never would have entered her house, Wahab having recently been battered there; (2) Smith was inside Jaques's house when she heard gunshots outside and "he did not do that"; (3) "Carrie" was in the house at the time of the murder and "did not remember seeing" Wahab. |
| Exhibit C to Mesa-White Decl., Dkt. No. 81-3 (Call C) | Jaques states: (1) Patterson was directing people the night of the murder |
| Exhibit D to Mesa-White Decl., Dkt. No. 81-4 (Call D) | Patterson's girlfriend states: (1) Patterson's van was broken the night of the murder; (2) the photo she saw depicted a different van; (3) the "van had been out of commission for a while now" |
| Exhibit E to Mesa-White Decl., Dkt. No. 81-5(Call E) | Patterson's girlfriend states: (1) Patterson's van was broken the night of the murder; (2) Police showed her a picture of a van from the night of the murder that doesn't look like their van |

The Court has also reviewed the entire transcript from Smith's criminal trial, in particular Wahab's testimony. Because her testimony on direct examination is central to Smith's arguments about the *Brady* material and the Court's analysis, the Court summarizes it below:

**General Background**

- Wahab acknowledged she was receiving beneficial sentencing for her role in Ambers's death in exchange for her testimony in Smith's trial. Dkt. No. 64-12 at 7.

- She had known Smith for about a year at the time of the murder. *Id.* at 8; she was a sex worker and Smith was pimping for her. *Id.* at 9.

- Wahab was afraid of Smith because he would "pistol-whip" her, and she witnessed him commit several other violent acts. *Id.* at 10. She felt Smith controlled her through this violence, as well as by controlling Wahab's access to methamphetamine, to which she was addicted at the time. *Id.* 10-11

- Wahab lived at Brandy Jaques' house in October 2016. *Id.* at 11.

6

- Wahab spent considerable time with Smith and witnessed interactions between Smith and Patterson. She stated that "[t]he defendant [Smith] was the one calling all the shots, and Patterson was just more quiet and will listen to what he was told by the defendant." *Id.* at 12.

- She also identified Smith's phone number and identified two of her own phone numbers. *Id.* at 32, 57.

- She identified her voice and Ambers's voice in a voice mail from the night of the murder. The voice mail was the result of an unintended call, referred to in the trial transcript as a "butt dial." *Id.* at 33, 37.

- After the murder, Wahab received a letter from Smith while she was detained in Hennepin County Jail. *Id.*at 34. The letter contained a code consisting of circled numbers, which Wahab believed to be a threat to her life and her daughter's life. *Id.* at 35-37.

**October 28, 2016**

- Wahab saw Smith at Jaques's house late that night. He had what she described as a semi-automatic, .45-caliber gun. He also had a revolver. *Id.* at 13.

- She witnessed Smith shooting at somebody outside of Jaques's house, near the curb. *Id.* at 13-14. She then left the area with her cousin. *Id.*

**October 29, 2016**

- Later that night—after midnight—Wahab returned to Jaques' house. *Id.* at 14-15.

- She went to a SuperAmerica gas station with Patterson and Smith in a van Patterson was driving. *Id.* at 15. They parked in the parking area and later moved the car to a gas pump. *Id.* at 15-16.

- After watching video surveillance from the SuperAmerica, Wahab identified herself and Smith in the video. *Id.* at 16-17.

- At SuperAmerica, she encountered Ambers sitting in his car, but she ignored advances he made toward her. Smith spoke with Ambers as well. *Id.* at 17. Smith then informed Wahab and Patterson that Ambers had money and drugs and the three "agreed to rob" Ambers. *Id.* at 18.

- Wahab then got in the car with Ambers under the guise of a sex work transaction and the two went to Ambers sister's house. *Id.* at 19. Wahab stayed in the car while Ambers smoked with his sister. They stayed at the sister's house for approximately 10 minutes. *Id.* at 20. Then Ambers and Wahab then went back to Jaques house. *Id.* at 19.

- Wahab believed Patterson and Smith were going to follow Ambers's car, but ultimately did not do so. She attempted to contact Smith via text and calls. *Id.* at 20. After reaching Smith, he told her that he and Patterson were following her. *Id.*

- After arriving back at Jaques's house, Wahab got out of the car and went inside where she encountered Smith who was unhappy that Wahab had not gotten any money or drugs from Ambers. *Id.* Smith directed her to go back and get the money and drugs. *Id.*

- Wahab went back outside where Ambers was still in his car. She got back in the car and talked with Ambers. *Id.* at 23-24. Then Wahab saw Patterson approach the car. He opened the car door and pushed Wahab out of the car. *Id.* at 24.

8

- While Wahab was walking away toward Jaques's house, she heard three gunshots. *Id.* She did not look back and walked into Jaques house. There was no one else in the house. *Id.* at 25.

- A couple of minutes later, Patterson came into the house and together he and Wahab got in Patterson's van and drove to a bridge over the Mississippi River. *Id.* at 26-27. En route, Wahab got a phone call from Smith; she handed the phone to Patterson and could hear Smith ask "Did you take care of that?" *Id.*

- Patterson then handed Wahab an item wrapped in a towel and Wahab threw the item in the river. Wahab believed the item was a handgun. *Id.* at 28.

- Patterson then drove Wahab back to Jaques's house where Wahab stayed. *Id.* at 29.

- The following day, Wahab overheard a conversation between Smith and Jaques. Smith told Jaques that Wahab "knew too much" and that he wanted to kill her. *Id.* at 30-31. Wahab immediately left Jaques's house through a window. *Id.* at 31.

Based on review of the entire record and for the reasons explained below, the Court recommends Smith's petition be denied.

## CONCLUSIONS OF LAW

As already mentioned, this Court has determined that Smith fairly presented his *Brady* claim to the Minnesota Supreme Court. *See* Order; Dkt. No. 42. While the Minnesota Supreme Court did not address the substance of that claim on Smith's appeal (*see id.*), the Court presumes it was adjudicated on the merits, because a state court need not enumerate reasons for denying each claim. Instead, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must

presume that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). Because the Minnesota Supreme Court adjudicated Smith's *Brady* claim on the merits, this Court may only grant his habeas petition if the Minnesota Supreme Court's determination was contrary to, or an unreasonable application of, clearly established Federal law. 28 U.S.C. § 2254(d)(1).

## I.      No Application of Federal Law

As a threshold matter, because the Minnesota Supreme Court's disposition of Smith's *Brady* claim did not involve analysis of the substance of that claim, this Court cannot review that finding for an "unreasonable application" of Federal law. *See id.* As detailed above, the Minnesota Supreme Court instead only dealt with Smith's *Brady* arguments through his appeal of denied motions to continue his trial. *See Smith*, 932 N.W.2d at 268-269. The court thus applied the legal standard applicable to continuance motions in Minnesota state court, not violations of *Brady*—a guarantee under federal law. *See id.* The Minnesota Supreme Court's analysis addressed trial error rather than a due process violation. This Court thus cannot grant habeas relief based on unreasonable application of Federal law. 28 U.S.C. § 2254(d)(1).

## II.     Minnesota Supreme Court's Determination was not Contrary to Federal Law

To determine whether the Minnesota Supreme Court's decision on Smith's *Brady* claim was contrary to law, this Court must necessarily analyze the merits of the claim. Under *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution may violate due process where it suppresses evidence that is "material to guilt, punishment or the credibility of a witness" regardless of whether the suppression is done in good or bad faith. *United States v. Chappell*, 990 F.3d 673, 678 (8th Cir. 2021) (citing *Brady*, 373 U.S. at 87; *Giglio v.*

*United States*, 405 U.S. 150, 154 (1972)). The government's duty to disclose exculpatory evidence applies regardless of whether a defendant requests such evidence. *United States v. Agurs*, 427 U.S. 97, 107 (1976). Furthermore, "Brady material" includes impeachment evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985), and information "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

To establish a violation of due process under *Brady*, Smith must prove that (1) the prosecution suppressed evidence, (2) the evidence was favorable to him, and (3) the evidence was material to his guilt or punishment. *Mandacina v. United States*, 328 F.3d 995, 1001 (8th Cir. 2003) (citing *United States v. Carman*, 314 F.3d 321, 323-24 (8th Cir. 2002). To demonstrate materiality in this context, Smith "must show there is a reasonable probability that if the allegedly suppressed evidence had been disclosed at trial the result of the proceeding would have been different." *Id.* (quoting *Drew v. United States*, 46 F.3d 823, 828 (8th Cir. 1995)). "A 'reasonable probability' of a different result exists where the nondisclosure undermines confidence in the outcome of the trial." *Id.* (citing *Bagley*, 473 U.S. at 678) (internal quotation marks omitted). The "critical question" is whether the verdict is "worthy of confidence." *United States v. Almendares*, 397 F.3 653, 664 (8th Cir. 2005) (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

**A.    Suppression of Evidence Favorable to Smith**

Evidence is considered favorable under *Brady* if it is either exculpatory or has impeachment value. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The State acknowledges that the jail call recordings meet this element of a *Brady* claim—they contain evidence that was favorable to Smith for its impeachment value. Respondent's

11

Supplemental Mem. Opposing Petitioner's Writ of Habeas Corpus (Resp. Supp. Opp.) at 10-11; Dkt. No. 88 ("Here, the four jail call recordings that Petitioner identifies could be 'favorable to' Petitioner in the sense that they could be used, theoretically, to impeach some minor aspects of Wahab's testimony. Because Wahab was clearly an important witness for the State, Respondent agrees that these 4 jail calls can be considered *Brady* material."). Thus, only the first and third elements remain: the *Brady* material must have been both suppressed by the State and material to Smith's guilt or punishment.

Under *Brady*, suppression need not be active withholding or hiding of evidence. Instead, evidence is considered suppressed when it is not revealed in a timely manner regardless of whether it was withheld in good or bad faith. *Brady*, 373 U.S. at 87 (1963). Evidence will not be considered suppressed so long as it is disclosed "before it is too late for the defendant to use it at trial." *United States v. Jeanpierre*, 636 F.3d 416, 422 (8th Cir. 2011) (quoting *United States v. Almendares*, 397 F.3d 653, 664 (8th Cir. 2005)). Even where exculpatory evidence is disclosed during the course of the trial, *Brady* may not have been violated. *Id.* For example in *Jeanpierre*, though the government did not provide the defendant with potentially exculpatory fingerprint reports until trial was underway, there was no *Brady* violation where the defendant was able to use the evidence at trial, cross-examining witnesses and using the reports, citing them in his closing argument. *Id.* at 423.

Here, the parties' briefing dealt with the question of suppression in a somewhat cursory fashion. The State has argued that because the calls were disclosed six days ahead of trial, they were not suppressed under *Brady*. Resp. Supp. Mem. at 12-13; Dkt. No. 88; *see also* State's Supplemental Mem. at 4, n. 1; Dkt. No. 41 (citing *United States*

*v. Gonzales*, 90 F.3d 1363, 1368 (8th Cir. 1996)). Smith contends the calls were suppressed because his "opportunity to use" the evidence was "impaired." Petitioner Derrick Z. Smith's Supplemental Mem. of Law in Support of Petition (Pet. Supp. Mem.) at 15; Dkt. No. 80.

With the exception of Call C, the record suggests Smith's counsel was unable to review the contents of the calls prior to trial. Although Smith unquestionably had access to all of the calls prior to and during trial, the massive volume of calls in question hampered his ability to review, and therefore to use them in his defense. While Smith's counsel acknowledged that they were able to listen to "about a tenth" of the calls during the week of voir dire, that left nearly 70 hours of material unreviewed at the start of trial. Trial Transcript 716:12-15; Dkt. No. 64-9. Smith's lawyers represented to the court that they simply had not had enough time to review all the material and did not feel "competent to proceed" in a manner that would ensure "confidence in the outcome" of the trial. *Id.* at 722:13-723:21. Even assuming Smith's counsel had listened to the calls for 12 hours per day from the time they received the recordings to the beginning of voir dire, they would not have heard them all. Disclosure of evidence without sufficient time to review it is tantamount to nondisclosure.

Unlike in other cases where *Brady* material was disclosed during trial, Smith was unable to make use of Calls B, D, and E in his defense. Contrast that with *Almendares,* where the defendant learned at trial that one of the government's witnesses had tentatively identified someone other than the defendant as the perpetrator of the charged crime. 397 F.3d 653. This disclosure was made in time for the defendant to cross-examine the witness about that identification and his other testimony and the late disclosure thus

did not violate *Brady*. *Id.* at 664. That is not the case here, where Smith had access to the calls but was unable to employ them at all at trial. While Smith now contends he could have used the recordings to impeach a state witness—as the defendant in *Almendares* did—the sheer volume of call recordings Smith received only days before trial made that use infeasible in his case. Because the key question is the timeliness of the disclosure, and the recordings of Calls B, D, and E were disclosed too late for Smith to use them, the evidence was suppressed under *Brady*. *See United States v. Jeanpierre*, 636 F.3d at 422.

Call C is different however. Unlike Calls B, D, and E, Smith's counsel did review Call C before trial, reporting its contents to the trial judge in support of his motion to continue the trial. *See* Declaration of Sebastian Mesa-White (Mesa-White Decl.) at ¶ 6, Dkt. No. 81; Exhibit A at 2-3, Dkt. No. 81-1. This muddies the waters of the suppression analysis because Smith could have used the contents of that call to cross-examine Wahab as in *Jeanpierre*.[1] 636 F.3d at 422; *see also Almendares*, 397 F.3d 653. While that possibility precludes a finding that Call C was suppressed, looking at the whole of the 75 hours of recordings and Smith's inability to mobilize them in his defense, the calls were suppressed for purposes of *Brady*. *Jeanpierre*, 636 F.3d at 422.

**B.   Prejudice to Smith**

The State's suppression of favorable evidence is not enough on its own to violate due process under *Brady*. Smith must also demonstrate that the suppressed evidence was material to guilt or punishment. *Brady*, 373 U.S. at 87. Evidence is considered material when there is "reasonable probability that if the allegedly suppressed evidence

---

[1] With respect to this specific call, Smith contends he would have impeached Wahab's claim that Smith was calling the shots, given Jaques's statement that Patterson was directing the crime. Pet. Supp. Mem. at 13, Dkt. No. 80.

had been disclosed at trial the result of the proceeding would have been different." *Mandacina*, 328 F.3d at 1001. Whether evidence is material depends on the entirety of the record, as "the relative strengths of the prosecution's case and the impeachment value of undisclosed evidence bear on whether disclosure in time for use at trial would have made a difference." *United States v. Chappell*, 990 F.3d 673, 679 (8th Cir. 2021) (quoting *United States v. Dones-Vargas*, 936 F.3d 720, 722-23 (8th Cir. 2019)). Where, as here, the *Brady* material is impeachment evidence, the court asks whether the prosecution's case hinged on that evidence or whether other "witnesses testified to the same or similar facts." *Id.* (citing *Dones-Vargas*, 936 F.3d at 722-23)). Impeachment evidence that is "so devastating as to undermine the entire prosecution" is material. *Dones-Vargas*, 936 F.3d at 723. Put differently, Smith may prove a *Brady* violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435 (citing *Bagley*, 473 U.S. at 678). The Court considers the materiality of the calls "collectively, not item by item." *Id.* at 436. It is the cumulative effects of suppression that determine materiality. *Id.* at 437.

Smith argues that Wahab's testimony was the prosecution's lynchpin and, but for her testimony, the case would have fallen apart. Pet. Supp. Mem. at 17-20, Dkt. No. 80. He argues that even the State's so-called corroborating evidence was no such thing. *Id.* at 18-19. For example, Smith contends the evidence that corroborated Wahab's testimony "was only probative because it was verified by Ms. Wahab." *Id.* He specifically argues that video footage from a Super America, taken on the night of the murder, cannot corroborate Wahab's testimony because Wahab herself identified Smith in the

SuperAmerica video. *Id.* According to Smith, "[t]he State's story always leads back to Ms. Wahab's testimony." *Id.* at 18. Because of Wahab's centrality to the State's case, her reliability was particularly important, and therefore Smith's case relied heavily on his ability to impeach her, he claims. *Id.* Lastly, Smith argues that not only did the suppression of the call recordings prejudice his ability to impeach Wahab, it also denied him the opportunity to investigate information learned through those calls. *Id.* at 20.

The State argues Smith did not sustain any prejudice without the jail call recordings. Def. Supp. Mem. at 12-15, Dkt. No. 88. Because Wahab did not make any of the jail calls at issue, the cases Smith cites to support his prejudice argument are inapposite, the State contends. *Id.* at 15. The State further suggests this Court need not address prejudice at all because the Minnesota Supreme Court already determined Smith suffered no prejudice. *Id.* at 13 (citing 28 U.S.C. § 2254(d)). While the Court assumes the Minnesota Supreme Court decided Smith's *Brady* claim on the merits, *Johnson v. Williams*, 568 U.S. at 301, that court only analyzed whether Smith suffered prejudice as a result of alleged trial error—that is, whether the trial judge's decision to deny his continuance "materially affected the outcome of the trial." *Smith*, 932 N.W.2d at 268-69.[2] With no specific analysis about potential prejudice under *Brady*, this Court must analyze the entirety of the record to determine whether the Minnesota Supreme Court's conclusion as to Smith's *Brady* claim was correct under the governing standard.

---

[2] The State similarly argues the Minnesota Supreme Court's analysis about the admissibility of the jail calls is owed deference. But again, because that analysis related to alleged trial error—denial of the continuance motion—the Court will not defer to it as to Smith's *Brady* claim.

Looking at the entirety of the trial record, *Chappell*, 990 F.3d at 679, the inclusion of the suppressed evidence would not have "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. At bottom, while Smith could have used the jail calls' content to cross-examine Wahab or investigate further, there was substantial evidence corroborating Wahab's testimony, generally bolstering her reliability, as described below.

First, Wahab's testimony as to her location throughout the night of the murder was corroborated by cell-site location information (CSLI), which placed her cell phone in the vicinity of each location she visited that night, in the same sequence. According to Wahab, she began the night at Jaques's house, then traveled to the SuperAmerica, then to Ambers's sister's house, back to Jaques's house, next, to a bridge over the Mississippi River, and finally back to Jaques's house again. Dkt. No. 64-12 at 4-63. The CSLI showed the same sequence. Tr., Dkt. No. 64-12, 136-143. Wahab's cell phone pinged a tower near 4600 Lyndale Avenue, near Jaques's house at 48th and Bryant Avenue. late on October 28. *Id.* 138. Around 3:30 in the morning on October 29, her cell phone pinged a tower at 2057 North Lilac Drive in Golden Valley, near the SuperAmerica. *Id.*, at 139. Next, her cell phone pinged a tower at 1931 West Broadway, in the vicinity of Jacquella Henderson's—Ambers's sister—home at 27th and Plymouth Avenue. *Id.* at 140. Around 4:30 am, her cell phone pinged near Jaques's home again. *Id.* From 4:54 am until 5:51 am, Wahab's cell phone pinged multiple towers, indicating she was in transit. The cell towers were all along the route from Jaques's house to the Dartmouth Bridge that crosses the Mississippi River on Huron Boulevard and then back to Jaques's house. *Id.* at 142-143.

Wahab's account that she went with Ambers to his sister's house was further corroborated by his sister, Jacquella Henderson. Henderson testified that Ambers and an African woman came to her address in the middle of the night on the 29th. Consistent with Wahab's testimony, Henderson stated Wahab did not get out of the car and that she did not let Wahab into her home. *Compare*, *id.* at 18-19 (Wahab) with *id.* at 69-81 (Henderson). She remembered the visit lasting roughly 30 minutes, which is longer than Wahab's remembrance that it was closer to 10. *See id.*

Wahab also testified that she saw Smith with firearms on the night in question, and that she witnessed him shooting at someone outside of Jaques's house. *Id.* at 13-14. The victim in that shooting, Deondre Young, testified at trial that it was Smith who shot him around the same time Wahab identified. Dkt. No. 64-10 at 112-121. Same as Wahab testified, Young stated Smith had a revolver. *Id.* at 124 (Young); Dkt. No. 64-12 at 13 (Wahab).

Wahab's own account at trial also matched the account she provided to law enforcement throughout disposition of her own criminal case, as well as Smith's proceeding. For example, Sergeant James Jensen described Wahab's earlier account of the night of the murder, which matched the testimony Wahab gave at trial. *Compare* Dkt. no. 64-12 at 91-96 (Jensen) with *id.* at 4-63 (Wahab). Other details from Wahab's testimony were borne out through other evidence: she testified Smith had two firearms on the night of October 28-29; Eden Prairie Police Department Officer Brandon Carlston testified two guns were found on Smith's person when he was arrested. Dkt. No. 64-10 at 180. Wahab testified that Smith had a revolver; ballistics analysis suggested a .38 caliber revolver was used in Ambers's murder. *Id.* at 40-41. Wahab identified her voice

on the "butt dial" both when she spoke to police pre-trial and in her trial testimony. Dkt. No. 64-12 at 78, 32-34.

Smith specifically contends that "the State's story always leads back to Ms. Wahab's testimony." Pet. Supp. Mem. at 18, Dkt. No. 80. He points to the surveillance video footage from SuperAmerica as one such example. According to Smith, that video and other evidence, such as the CSLI, was "only probative because it was verified by Ms. Wahab." *Id.* But that reasoning is circular and ignores the fact that it was not Wahab, but rather Ramar Donnell, the recipient of the "butt dial," who led police investigators to the SuperAmerica. Dkt. No. 64-12 at 85-86.[3] Smith also points out that Wahab verified Smith's phone number, helping link him to CSLI tracking his movements. Pet. Supp. Mem. at 18, Dkt. No. 80. Again, however, that contention ignores the evidence at trial, which established that police identified Smith's phone number through Wahab, "a person known to Derrick Smith," and by matching up phone call records with the timing of a call Smith made while at SuperAmerica, as seen on the store's surveillance video. Dkt. No. 64-12 at 81-82.

Because Wahab was the lynchpin in the State's case according to Smith, he argues he relied on undermining her credibility in defending himself. Without the jail call

---

[3] Q: From speaking with Mr. Donnell in addition to the voicemail message that was left on his phone from Mr. Ambers' phone, did you learn anything else of interest that led your investigation?
A (Sgt. Jensen): Mr. Donnell said that he had had contact with Mr. Ambers at the SA at 57th and Logan. Actually, I believe he said '57th and Humboldt,' but — actual address is 57 and Logan.
Q: And is that what initially led you during your investigation to that particular SuperAmerica?
A: Yes.
Trial. Tr., Dkt. No. 64-12, 85:21-86:9.

recordings he was unable to do so, he argues. Pet. Supp. Mem. at 19, Dkt. No. 80. But Smith overstates the value of the calls. As already explained, Wahab's testimony was corroborated through various sources, supporting the jury's belief in the veracity of her account. While additional cross-examination about other accounts of the evening might have chipped away at her credibility, the Court cannot say that the likely incremental change in their trust in her testimony would "undermine confidence in the outcome" of the case. *Mandacina*, 328 F.3d at 1001. The suppressed evidence was not "so devastating as to undermine the entire prosecution." *Dones-Vargas*, 936 F.3d at 723.[4]

Smith avers that his case is similar to others where the court has found prejudice. But those cases are distinguishable in important ways. In *Kyles*, the petitioner argued eyewitness statements made immediately after a murder were suppressed in violation of *Brady*. 514 U.S. at 441. In analyzing the claim, the Court explained that two of the eyewitnesses also testified at Kyles's trial but Kyles did not have the benefit of their police statements during cross examination. *Id.* For example, one eyewitness originally described the perpetrator as 5'4" or 5'5" and 140-150 pounds, but the defendant (Kyles) was 6' and thin. Furthermore, the defense presented an alternative perpetrator who fit the eyewitness's description. Kyles was unable to ask about these inconsistencies, which could have sowed considerable doubt as to who committed the crime. *Id.* Yet another

---

[4] One of the calls could, in fact, corroborate part of Wahab's testimony. During Call B, Jaques and Ginger discussed "Carrie," who reported to Ginger that she was in the house at the time of the murder and did not remember seeing Wahab there. But Wahab also testified that she did not see anyone in the house when she entered after hearing the gunshots. Dkt. No. 64-12 at 25. Even if the jurors heard the recording, they could have reasonably believed that both Carrie and Wahab were in Jaques's house that night but did not cross paths. This is not the type of "devastating" evidence that would have undermined the State's "entire prosecution." *Dones-Vargas*, 936 F.3d at 723.

eyewitness testified at Kyles's trial where his testimony differed markedly from the statement he made to police immediately after witnessing the crime. In particular he testified that he saw Kyles take a .32 caliber gun from his pocket and shoot the victim in the head before driving away in the victim's car. *Id.* at 441. But his statement to police on the date of the crime suggested he had not seen who shot the victim, and that he only saw the perpetrator after the fact when he was inside the victim's car. *Id.* at 442. These and other inconsistencies "would have fueled a withering cross-examination, destroying confidence in [the witness's] story and raising a substantial implication that the prosecutor had coached him to give it." *Id.* at 443.

The cross-examination value of the jail recordings in Smith's case is significantly weaker than the impeachment value of the eye-witness statements in *Kyles.* Unlike in *Kyles*, where the suppressed statements were made by trial witnesses, the jail recordings are not Wahab's own statements. While the calls provide an alternative narrative to Wahab's memory, they do not necessarily impeach Wahab's own perception of events; put differently, though there are inconsistent statements, they come from different declarants, reducing their weight. Though they may call into doubt Wahab's recollection of the events, they do not themselves call into doubt her propensity for telling the truth, a key distinction from *Kyles*.

Smith's reliance on *Boyette* is similarly unavailing. In that case, the petitioner had been convicted of robbery, attempted murder, arson, burglary, assault, and reckless endangerment. 246 F.3d 76 (2d Cir. 2001). He moved for habeas relief alleging a violation of *Brady*. The court concluded that the evidence in question, including an earlier statement from the victim, was favorable to Boyette and had been suppressed by the

government. The court then analyzed prejudice, explaining that the "only evidence against Boyette was Ehrlich's [the victim] testimony" and that several other witnesses provided testimony that Boyette was in a different state at the time of the crimes. *Id.* at 93. Putting a fine point on it, the court explained that "[o]nly by crediting Ehrlich's testimony and rejecting that of the alibi witnesses could a reasonable jury find Boyette guilty beyond a reasonable doubt." *Id.* Erlich's prior inconsistent statement was therefore prime fodder to impeach her.

While Wahab's testimony was certainly important to the State's case here, she was not the only witness to link Smith to the murder. For example, Smith's CSLI linked him to the relevant locations on the night of the murder, as did Deondre Young's testimony, and the SuperAmerica surveillance video. While the jail call recordings might have cast some doubt on Wahab's memory or perception of events, they are insignificant compared to the whole of the trial record. *Chappell*, 990 F.3d at 679.

Lastly, Smith contends that if he had had the jail call recordings earlier, he could have done additional investigation, including investigating the status of Patterson's van and attempting to find "Carrie," whom Jaques and Ginger referenced in Call B. Pet. Supp. Mem. at 13-14, Dkt. No. 80. But Smith's belief that these investigations might lead to exculpatory evidence is largely speculative. *See United States v. Mayweather*, 393 F. Supp. 3d 792, 800 (D. Minn. 2019) ("Mayweather has not demonstrated that any of the location data would contradict the evidence of the March 2016 controlled buy that the United States presented during its rebuttal case. Instead, he merely speculates that it *might* contradict that evidence.") Indeed, Carrie's presence at Jaques's house or the ownership of the car Wahab traveled in on the night of the murder do not obviously bear

on Smith's guilt or innocence and instead appear to merely offer topics for Wahab's cross-examination. And again, Wahab's testimony was corroborated through other witnesses and evidence at trial. Any small benefit Smith may have received from cross-examining her about Carrie and Patterson's van would not have undermined confidence in the verdict. *Mandacina*, 328 F.3d at 1001.

Because the suppression was not prejudicial, the Minnesota Supreme Court's determination was not a misapplication of federal law, and the Court recommends that Smith's petition for a writ of habeas corpus [Dkt. No. 1] be denied.

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS THAT:

Smith's Petition for a Writ of Habeas Corpus [Dkt. No. 1] be **DENIED**.

Dated: June 22, 2023                    __ s/David T. Schultz _____
                                        DAVID T. SCHULTZ
                                        United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).